# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

| | | |
|---|---|---|
| **GEORGE HENRY WILDER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 2:14-03283** |
| | ) | |
| **CAROLYN W. COLVIN ,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for child's insurance benefits based on disability and Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. By Standing Order entered February 2, 2014 (Document No. 13.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Neither party has filed briefs in the matter.

The Plaintiff, George Henry Wilder, (hereinafter referred to as "Claimant"), filed an application for SSI on November 2, 2009 (protective filing date), and on November 16, 2009, he filed an application for child's insurance benefits based on disability, alleging disability in both applications as of May 17, 1982, due to benign tumors throughout his body and back problems.[1] (Tr. at 10, 155-61, 162-65, 175, 207.) The claims were denied initially and upon reconsideration. (Tr.

---

[1] On his form Disability Report - Appeal, undated, Claimant asserted that he suffered "ongoing problems with Neurofibromatosis, gets dizzy and lightheaded, [and experienced] increased depression." (Tr. at 248.)

at 55-58, 60-63, 64-67, 68-70, 71-73.) On June 16, 2010, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 74-76.) A hearing was held on May 16, 2012, before the Honorable Todd Spangler. (Tr. at 25-54.)  By decision dated June 25, 2012, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 10-9.) The ALJ's decision became the final decision of the Commissioner on August 29, 2013, when the Appeals Council denied Claimant's request for review. (Tr. at 1-5.) Claimant filed the present action seeking judicial review of the administrative decision on October 28, 2013, pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2012). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall

v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2012). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we

3

consider when we rate the degree of your functional limitation.

   (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

   (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[2] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§

---

   [2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity at any time during the period being adjudicated. (Tr. at 12, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from borderline intellectual functioning, which was a severe impairment. (Tr. at 12, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 14, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but with the following nonexertional limitations:

> limited to 1, 2, 3, step instructions in a non-quota or non-production rate work environment and he can tolerate no more than occasional contact with coworkers, supervisors or the public.

(Tr. at 16, Finding No. 5.) At step four, the ALJ found that Claimant had no past relevant work. (Tr. at 17, Finding No. 6.) On the basis of testimony of a Vocational Expert ("VE") taken at the

administrative hearing, the ALJ concluded that Claimant could perform jobs such as a farm worker, janitor, and garbage collector at the unskilled, heavy level of exertion; jobs such as a farm worker, kitchen helper, and janitor at the unskilled, medium level of exertion; and finally, jobs such as a dishwasher, janitor, and farm worker at the unskilled, light level of exertion. (Tr. at 18, Finding No. 10.) On this basis, benefits were denied. (Tr. at 19, Finding No. 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was born on May 17, 1982, and was 29 years old at the time of the administrative hearing, May 16, 2012. (Tr. at 17, 29, 30, 155, 162.) Claimant had at least a high school education and was able to communicate in English. (Tr. at 18, 29, 206, 210.) Claimant had no past relevant

work. (Tr. at 17, 30, 208.)

 The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence of record, and will discuss it below as it relates to the undersigned's findings and recommendation.

Jamie Jarboe, M.D. - Consultative Examination:

On December 12, 2009, Dr. Jarboe conducted a consultative examination at the request of the state agency. (Tr. at 321-26.) Claimant reported back problems, characterized by an achy back constantly located along his lumbar spine with occasional burning and warm type pain, and sometimes sharp pain. (Tr. at 321.) He also reported a left arm deformity, on which he was told to have surgery but it was not performed. (Id.) Claimant reported that his ribs pressed into his left ventricle, which caused shortness of air with exertion. (Id.) He related that he could sit for 20 to 30 minutes at a time, could stand for 10 to 15 minutes, and could walk a couple of blocks. (Id.) He stated that he could crawl and squat, maneuver up and down stairs, lift and carry 10 to 15 pounds, was right-handed, and did not have a driver's license. (Id.)

On physical examination, Dr. Jarboe noted that Claimant ambulated without an assistive device, had no lower extremity edema, presented with multiple flesh colored papules scattered over his trunk and arms and multiple café au lait spots. (Tr. at 323.) He observed crepitus with range of lumbar motion. (Id.) Claimant had normal 5/5 strength in the upper and lower extremities, intact sensation, normal posture and gait, and normal range of motion evaluation, but Dr. Jarboe was unable to elicit deep tendon reflexes. (Id.)

Dr. Jarboe assessed a past medical history of neurofibromatosis and back pain and noted that his concerns regarding Claimant's capabilities were mild on physical exam. (Tr. at 323.) He reiterated Claimant's subjective reports of physical capabilities and noted that Claimant's left arm

was deformed at the forearm aspect and that he likely would benefit from surgery, although Dr. Jarboe did not note any decreased grip strength or trouble with fine manipulation. (Id.)

Frances Breslin, Ph.D. - Psychiatric Review Technique & Mental RFC Assessment:

On February 26, 2010, Dr. Breslin, a state agency consultant, completed a form Psychiatric Review Technique, on which Dr. Breslin opined that Claimant's borderline intellectual functioning resulted in mild restrictions of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration. (Tr. at 327-40.) In reaching this opinion, Dr. Breslin reviewed Dr. Twehues's consultative evaluation report. (Tr. at 339.) Dr. Breslin also completed a form Mental RFC Assessment, on which she opined that Claimant was limited moderately in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, respond appropriately to changes in the work setting, and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. at 341-43.) In all other functional areas, Dr. Breslin opined that Claimant was not significantly limited. (Id.) Dr. Breslin further opined that Claimant can understand and remember simple and some detailed instructions; can consistently attend to and complete simple 1-2 step tasks; can complete a typical 8-hour workday and that maintenance of an acceptable work schedule is not precluded by his psychiatric condition; can interact appropriately with the public, peers, and supervisors in the work environment; and can adapt to typical work changes and make future plans. (Tr. at 343.)

On March 11, 2010, Dr. Breslin submitted a statement that indicated since the consultative evaluator indicated no mental diagnosis and his then current IQ was borderline intellectual functioning and testing at age six indicated an average IQ, Dr. Breslin opined that it could be

assumed "that the [C]laimant was at least [BIF] prior to age 22." (Tr. at 345.) Dr. Breslin therefore, indicated that her opinions were appropriate for both Claimant's then current functioning and his functioning prior to age 22. (Id.)

Mary K. Thompson, Ph.D. - Psychiatric Review Technique & Mental RFC Assessment:

On June 2, 2010, Dr. Thompson completed a form Psychiatric Review Technique on which she also opined that Claimant's borderline intellectual functioning resulted in mild restriction of activities of daily living; mild limitations in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (Tr. at 346-59.) She noted that she affirmed Dr. Breslin's assessment of February 26, 2010, and noted that the additional information which indicated that Claimant continued to have depression and problems with comprehension, did not provide additional findings that limited the initial functional assessment. (Tr. at 358.) On her Mental RFC Assessment, Dr. Thompson assessed the same moderate limitations as did Dr. Breslin. (Tr. at 360-63.)

Diosdado Irlandez, M.D. - Case Analysis:

On June 8, 2010, Dr. Irlandez submitted a Case Analysis on which he noted Claimant's physical allegations of benign tumors throughout his body with disfigurement, dizzy spells, problems sitting for long periods of time due to back and hip problems, and a new condition of poor stamina. (Tr. at 364.) Dr. Irlandez noted that on reconsideration, there were no new treating sources or medical findings. (Id.) Although Claimant submitted his activities of daily living, Dr. Irlandez noted that they did not change his physical RFC of non-severe. (Id.) Dr. Irlandez therefore, affirmed the non-severe finding from the initial assessment. (Id.)

Jessica Twehues, Psy.D. - Psychological Assessment:

On December 29, 2010, Dr. Twehues conducted a psychological assessment. (Tr. at 365-70.)

Claimant was driven to the evaluation by his parents and appeared appropriately dressed with good personal hygiene. (Tr. at 366.) Dr. Twehues noted that Claimant was pleasant and cooperative, had a euthymic mood and appropriate affect, had low energy, exhibited clear and articulate speech, maintained good eye contact, was alert, frequently changed position in his seat, and presented logical, relevant, and coherent thoughts. (Id.) He reported that he was applying for disability due to problems related to neurofibromatosis. (Id.) He also indicated that he had a crooked arm, which made it difficult for him to drive, stand for long periods of time, walk, lift things, and use his hands. (Id.) He denied then current medical treatment or medications. (Id.) He reported that he experienced a lot of stress related to daily complications from his condition and explained that it took him a long time to complete tasks. (Id.) His moods depended on his pain and he easily became upset if in pain. (Tr. at 367.) He felt depressed at times with many worries, especially due to his worsening condition. (Id.) He reported low energy and stated that he became short-winded easily due to his ribs pressing into the left ventricle of his heart. (Id.) He reported that he often was tense and irritable. (Id.)

Claimant indicated that he did not complete household chores due to back pain. (Tr. at 367.) He also did not drive or use public transportation. (Id.) He reported that he often stayed in bed. (Id.) He stated that he could use the telephone, read and write, and use the postal service, but did not know how to manage his finances as he had never been employed. (Id.) On mental status exam, Dr. Twehues noted that Claimant was alert and focused, had good attention and concentration, and appeared to give good effort and persistence on all tasks. (Id.) Results of the intellectual functioning testing (WAIS-IV), revealed a verbal comprehension IQ of 78 and a full scale IQ of 72. (Tr. at 368.) Dr. Twehues opined that overall his scores placed him in the borderline range of intellectual functioning, with a relative weakness in processing speed. (Tr. at 368-69) Dr. Twehues declined to

offer a diagnosis but assessed a GAF of 55.[3] (Tr. at 369.) She opined that his "difficulties seem related to his physical condition, neurofibromatosis, rather than mental health problems." (Id.) She thought that he could benefit from consulting a physician to determine if medical treatments were available to relieve his physical symptoms. (Id.) She further opined that Claimant appeared able to understand and remember simple and complex instructions, got along fairly well with others, did not  understand or remember instructions well due to difficulties concentrating, and his ability to adapt and respond to work pressure likely was limited due to his physical pain. (Id.) She further opined that Claimant would benefit from a payee to manage his benefits as he had never budgeted and managed his finances. (Tr. at 370.)

Cathy Wilder - Third Party Function Report:

      Cathy Wilder, Claimant's mother, submitted a Third Party Function Report, dated November 24, 2009. (Tr. at 178-86.) Mrs. Wilder reported that Claimant lived in an apartment with her and her husband and that due to pain, he did nothing all day. (Tr. at 179.) She indicated that he slept very little, had problems with maintaining his personal care due to limited mobility, and never prepared meals or performed household chores or yard work due to neurofibromatosis. (Tr. at 179-81.) Mrs. Wilder stated that Claimant rarely went outside, but if he went somewhere he rode in a car and was unable to drive. (Tr. at 182.) Claimant did not do any shopping, paying of bills, counting change, handling a checking account, or using a checkbook or money orders due to his limited education. (Id.) She reported that his interests included watching television and that if he went somewhere, someone had to accompany him. (Tr. at 183.) Mrs. Wilder noted that Claimant was "increasingly

---

      [3]    The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 51-60 indicates that the person has "[m]oderate symptoms . . . or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV") 32 (4th ed. 1994).

combative, depressed, forgetful, and sad." (Tr. at 184.) She further noted that due to his neurofibromatosis and associated pain, Claimant's following abilities were affected: lift, squat, bend, stand, reach, walk, sit, kneel, stair climb, memory, concentration, completing tasks, understanding, following instructions, using hands, and getting along with others. (Id.) She indicated that he was able to walk one half a block, could pay attention for one to two minutes at a time, and that he had poor ability to follow written and spoken instructions. (Id.) She further indicated that he had poor ability to handle stress and change in routine, and that he feared handling the pain of death. (Tr. at 185.) Claimant completed a Function Report, also dated November 24, 2009, which reiterated what Mrs. Wilder reported. (Tr. at 196-205.)

Claimant's Challenges to the Commissioner's Decision

Neither the Commissioner nor the Claimant filed briefs in this matter, and Claimant's Complaint fails to set forth any specific claims. In his "Appeals Memorandum," Claimant alleges that the "ALJ erred in giving the CE's hypothetical to Vocational Expert and accepting the answer at the hearing, however the ALJ then sent to a different VE in order to deny the Claimant." (Tr. at 317-20.) The undersigned notes that Claimant's Appeals Memorandum is the same as his Prehearing Statement (Tr. at 300-04.), with the exception of the information regarding the nature of the case and the three-line allegation regarding the hypothetical. The undersigned notes that Claimant was represented by counsel at all levels of review, and was represented by counsel until the case was transferred to this District. As Claimant has not raised any specific arguments at this level of review, the undersigned will consider his claim raised in his Appeals Memorandum and additionally has reviewed the entire record to see if it comports with the substantial evidence standard.

Analysis.

Hypothetical Question.

Claimant essentially alleges that the ALJ erred in presenting Dr. Jarboe's "opinion" to the VE and then not adopting Dr. Jarboe's opinion and the VE's response to the hypothetical opinion. To be relevant or helpful, a vocational expert's opinion must be based upon consideration of all evidence of record, and it must be in response to a hypothetical question which fairly sets out all of the claimant's impairments. Walker v. Bowen, 889 F.2d 47, 51 (4th Cir. 1989). "[I]t is difficult to see how a vocational expert can be of any assistance if he is not familiar with the particular claimant's impairments and abilities – presumably, he must study the evidence of record to reach the necessary level of familiarity." Id. at 51. Nevertheless, while questions posed to the vocational expert must fairly set out all of claimant's impairments, the questions need only reflect those impairments that are supported by the record. See Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987). Additionally, the hypothetical question may omit non-severe impairments, but must include those which the ALJ finds to be severe. See Benenate v. Schweiker, 719 F.2d 291, 292 (8th Cir. 1983).[4]

---

[4] Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2012). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more

The ALJ posed one hypothetical question to the VE, which included the limitations set forth in Dr. Jarboe's opinion. (Tr. at 53.) The ALJ asked the VE to consider a young individual with a high school education, who could perform a limited range of light exertional level work. (Id.) The individual could stand for 30 minutes or less continuously, stand for 10 to 15 minutes or less continuously, and could walk the equivalent of a couple of blocks on a continuous basis. (Id.) The individual could perform occasional reaching in any direction with the left upper extremity; was limited to a low-stress environment with simple one-two-three step instructions; could have only occasional contact with coworkers, supervisors, and the public; and could not have any quota or production rate work. (Id.) The vocational expert responded that such an individual was unable to perform any work in the national and local economy given those limitations. (Tr. at 53.) The ALJ noted that these limitations were based upon Dr. Jarboe's narrative. (Id.)

In his decision, the ALJ summarized Dr. Jarboe's examination and noted that his clinical observations generally, were unremarkable. (Tr. at 13.) The ALJ noted Dr. Jarboe's concerns that Claimant's capabilities were mild regarding his past medical history of neurofibromatosis and back pain. (Id.) Based on Dr. Jarboe's narrative, the ALJ concluded that Claimant's neurofibromatosis with corresponding back pain was less than severe in nature. (Id.) The ALJ further noted that he was without the benefit of any statement from a treating physician regarding any functional limitations.

---

consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of state agency medical or psychological consultants. 20 C.F.R. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii) (2012). The ALJ, however, is not bound by any findings made by state agency medical or psychological consultants and the ultimate determination of disability is reserved to the ALJ. Id. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I).

(Id.) To the extent that Dr. Jarboe's narrative can be construed an opinion regarding Claimant's ability to sit, stand, and walk, the ALJ assigned the opinion negligible weight because the assessments were inconsistent with Dr. Jarboe's clinical observations and were a regurgitation of Claimant's subjective complaints at the beginning of the examination. (Id.) To the extent that Claimant alleges that the ALJ erred in rejecting Dr. Jarboe's assessment, the undersigned finds the ALJ's decision supported by the substantial evidence of record. It is clear from Dr. Jarboe's evaluation that the standing, walking, and sitting and other limitations indicated at the end of his evaluation report simply are restatements of Claimant's subjective reports at the beginning of the evaluation. There is nothing in Dr. Jarboe's examination or report to support such limitations and Dr. Jarboe even stated that Claimant's capabilities were mild. Thus, the undersigned finds that the ALJ properly discredited the physical limitations as re-stated by Dr. Jarboe. The ALJ duly noted during the administrative hearing that the state agency had met its burden by sending Claimant for a consultative examination and that it was Claimant's burden to establish disability. (Tr. at 45-46.) The ALJ explained that the agency could not create a medical history that did not exist. (Id.) The record establishes a lack of a treatment record. The only record consists of a psychological report from Dr. Twehues, which established Claimant's only severe impairment, his borderline intellectual functioning. Regarding the other opinion evidence, the ALJ gave significant weight to Dr. Irlandez's opinion, who opined that Claimant's physical impairments were less than severe. (Tr. at 13.) The ALJ noted that this opinion was consistent with Dr. Jarboe's clinical observations and was consistent with the lack of any medical treatment sought by Claimant. (Tr. at 13-14.)

In addition to the claim alleged in Claimant's Appeals Memorandum, the undersigned finds that a review of the entire record reveals that the decision of the Commissioner is supported by

substantial evidence. The ALJ thoroughly reviewed all of the medical evidence of record and considered the testimony of Claimant. (Tr. at 12-17.) The ALJ also complied with the applicable Regulations and case law in determining that Claimant did not have an impairment or combination of impairments that met or medically equaled a listed impairment, that Claimant was not entirely credible regarding the severity of his pain and other symptoms, and that Claimant was capable of performing work at all exertional level with certain nonexertional limitations, and could perform a significant number of jobs in the national economy despite his borderline intellectual functioning, a severe impairment.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then fourteen days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106

S.Ct. 466, 475, 88 L.Ed.2d 435 (1985), <u>reh'g denied</u>, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); <u>Wright v. Collins</u>, 766 F.2d 841, 846 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir.), <u>cert. denied</u>, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Copenhaver, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: February 26, 2015.

R. Clarke VanDervort
United States Magistrate Judge